**TEXAS & PAC. R. CO. et al. v. BROTHER-
HOOD OF RAILROAD TRAINMEN
et al.**

Civ. A. No. 1308.

District Court, W. D. Louisiana,
Alexandria Division.

April 17, 1945.

J. T. Suggs and M. E. Clinton, both of Dallas, Tex., Esmond Phelps, of New Orleans, La., Fred G. Hudson, Jr., of Monroe, La., H. Payne Breazeale, of Baton Rouge, La., Thomas T. Railey, of St. Louis, Mo., and Frank H. Peterman, of Alexandria, La., for plaintiffs.

Kemble K. Kennedy, of Baton Rouge, La., for defendants, Brotherhood of Railroad Trainmen and Rapides Lodge No. 856 of Brotherhood of Railroad Trainmen.

Fred G. Benton, of Baton Rouge, La., for individual defendants, who are employees of Texas & Pacific Ry. Co.

PORTERIE, District Judge.

A declaratory judgment under Section 274d of the Judicial Code, 28 U.S.C.A. § 400, 48 Stat. 955, is sought by this action of the complainants, the Texas and Pacific Railway Company and Guy A. Thompson, as Trustee of the Missouri Pacific Railroad Company, Debtor, and not individually, against the Brotherhood of Railroad Trainmen, Rapides Lodge No. 856 of the Brotherhood of Railroad Trainmen, and twenty-nine individuals, eleven of whom are not members of Rapides Lodge No. 856 or any other railroad labor organization.

The plaintiffs pray for a judgment "declaring that neither of plaintiffs is required by law to negotiate or sign an agreement or agreements with the Brotherhood of Railroad Trainmen amending or interpreting the contract of June 2, 1927; or, in the alternative, that neither of plaintiffs by signing said agreement or agreements thereby becomes liable to the individual defendants herein, or either of them, for the damages which they or any of them may sustain by reason of the execution of said agreement or agreements, amending or interpreting said contract of June 2, 1927; and that plaintiffs have such other, further, different and general relief, including costs, to which they may be entitled."

The complainants rely upon diversity of citizenship and the necessary amount, and an alleged federal question arising under the Railway Labor Act of 1934, 45 U.S.C.A. § 151 et seq., as amended, as a double basis for jurisdiction.

During the year 1926, the two railways consolidated their facilities covering the manning of yard and hostler service in the Alexandria Terminal, Alexandria, Louisiana, and made all of these facilities one common interchangeable yard.

The interests of the two sets of employees for the two carriers, represented by the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen, and the Brotherhood of Railroad Trainmen, became involved. A controversy followed. The respective committees of the three labor organizations having jurisdiction over the terminal facilities, being unable to agree as to the disposition of the issues, invoked the assistance of national officers. An agreement was reached in St. Louis on June 2, 1927, and made effective June 20, 1927, jointly executed by a duly authorized representative of each organization, whereby the work in the terminal was apportioned between the employees of the two railroads, based upon the ratio of business done at that time by the two carriers at the joint terminal.

The schedule of that contract covering the calling of crews to perform the terminal work allocated the maximum number of crews involved, thirty-two, between the trainmen of the respective railroads upon a fixed basis, which, roughly, approximated 55% Missouri Pacific trainmen and 45% Texas Pacific trainmen.

In the intervening years the Missouri Pacific terminal trainmen at the Alexandria terminal became dissatisfied with that allocation; contending that because of the change in the relative proportion of terminal business produced by those railroads and their number of terminal trainmen employed a greater percentage of the terminal work should be allocated to the Missouri Pacific trainmen; this contention was disputed by the Texas & Pacific men.

After controversy and action within the Trainmen's Union organization, the Trainmen's Union General Chairman for both railroads and the Vice-President of the National Trainmen's Brotherhood, on June 26, 1944, formally requested the personnel officers of both railroads to change the assignment schedule to a 65% Missouri Pacific and 35% Texas & Pacific basis. Before any action resulted, on June 5, 1944 certain Texas & Pacific employees brought suit in the state court at Baton Rouge, seeking to enjoin their own national Brotherhood and both railroads from changing the 1927 agreement in accordance with the findings and request of that national Brotherhood. A temporary restraining order was issued

and, after hearing, was recalled and vacated for failure to properly cite and serve the National Trainmen's Brotherhood, held to be a necessary party; pretermitting numerous other exceptions filed. Consequently, the action was dismissed by the district court.

Then, "suspensive and devolutive appeals" were taken to the Louisiana Supreme Court. A motion by defendants to dismiss that appeal was denied, but the appeal was sustained only as a devolutive appeal—which, in effect, sustained the motion to dismiss as to the suspensive appeal.

Meanwhile, on June 26, 1944, the attorney of record for the trainmen members of the Texas & Pacific Railway, plaintiffs in the state court action, served formal written notice upon the railroads, reasserting their rights under the 1927 contract, and gave formal notice of their intention to invoke all legal remedies available to compel by specific performance adherence to the contract by the railroads and, in default, their intention to sue for damages if any changes were made, by negotiation with the national Brotherhood.

At this juncture the present suit seeking a declaratory judgment was filed.

The individual defendants have filed three motions to dismiss the bill of complaint; first, for failure to allege facts sustaining the venue of the court; second, for failure to make necessary parties; third, for failure to state a claim or cause of action. The motion to dismiss for failure to allege facts sustaining the venue of the court was abandoned at the time of the oral argument upon motion of the attorney for these defendants. At oral argument and by subsequent brief the other two motions were declared to apply only to the alternative prayer of the railroads.

This brings us to a consideration of the two remaining qualified motions to dismiss: (a) for failure to make necessary parties, and (b) for failure to state a claim or cause of action.

(a) Motion to Dismiss for Failure to Make Necessary Parties.

■ For the sake of brevity we will refer hereafter to the Brotherhood of Locomotive Engineers as engineers, the Brotherhood of Locomotive Firemen and Enginemen as firemen, and the Brotherhood of Railroad Trainmen as trainmen. The motion to dismiss for failure to make necessary parties is based on two grounds: first, that the contract of June 2, 1927, includes the engineers and the firemen, hence those Brotherhoods should be joined as parties in the present suit; and second, that the plaintiffs acknowledge the engineers and firemen to be necessary parties to this suit by reason of allegations made in Section 2, Paragraph VIII of the bill of complaint.

The plaintiffs by motion in open court amended their bill of complaint so as to delete Section 2, Paragraph VIII thereof.

This deletion does away with whatever estoppel feature these allegations had, but cannot remove from consideration in this case the fact that the contract of June 2, 1927, was had by and between ⊔⊔e two carriers on the one hand and the engineers, the firemen and the trainmen on the other hand, and that the court has before it at this time only the trainmen. We had been much impressed in the early consideration of these motions that the action should be dismissed, since the trainmen alone were before the court and not the engineers and the firemen, who were participants in the original contract.

However, the record shows that a request for a change in the apportionment of work was denied by decision of the three executives of the three national Brotherhoods. An appeal was perfected only to the Board of Appeals of the Brotherhood of Railroad Trainmen. On October 26, 1943, the Board of Appeals reversed the decision of the chief executives, giving reasons.[1] All three Brotherhoods were originally parties; the voluntary leaving of two does not destroy the life in court of the third.

[1] "The fact that Grand Lodge officers of the three organizations were assigned with general committees of the M. P. and T. & P. Railways as a result of contention of the M. P. men that increase in their proportion of work in the terminal justified a change in the percentage established in 1927 indicates to this board that the Chief Executives recognized that a change in the 1927 percentage figures could be made if such a change was justified. Further, the Board cannot agree that fluctuations of 'ten percent in 1940, twelve percent in 1941 and twenty percent for 7 months in 1942,' indicating a progressive increased disparity between the business handled by the two properties, 'does not constitute a change in conditions under the law and policy of our organization,' as held by Vice President Smith and his associate officers."

■ Again, we should not dismiss because the Brotherhood of Railroad Trainmen were temporarily restrained, etc., by an order of the Nineteenth Judicial District Court, State of Louisiana, in Bujol et al. v. Missouri Pacific Railroad Company et al., No. 21579. As outlined hereinabove, this action brought about the formal notice to the carriers, placing them in a dilemma of damages.

■ Furthermore, the two Brotherhoods (Engineers and Firemen) are organized and exist under the laws of the State of Ohio and are domiciled in the city of Cleveland. Under the circumstances, the motion to dismiss filed by the individual defendants because these Brotherhoods are not made parties to the suit is disposed of by Rule 19(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, reading in part as follows: "* * * The court in its discretion may proceed in the action *without making such persons parties, if its jurisdiction over them as to either service of process or venue can be acquired only by their consent or voluntary appearance* * * *." (Emphasis ours.)

The fact that the engineers and the firemen might have an interest in the controversy does not mean that the court cannot proceed with the present litigation. Wyoga Gas & Oil Corporation v. Schrack, D.C. Pa.1939, 27 F.Supp. 35, affirmed on reargument, D.C.1939, 29 F.Supp. 582.

We rule that the engineers and firemen are not indispensable parties because of the following reasons:

1. They have, as a matter of fact, no interest in the subject matter of the litigation and will not be affected by the result.

2. The exceptors have themselves admitted in a solemn judicial proceeding that the engineers and firemen have no interest in the present controversy.

3. As a matter of law and under the decisions defining an "indispensable party," the engineers and firemen would not be classified as such in this litigation.

4. The exceptors themselves have by their own motion classified the engineers and firemen as "necessary" parties rather than "indispensable" parties.

5. The respective craftsmen—engineers, trainmen, and firemen—have dealt separately with the carriers, since the contract of June 2, 1927.

6. A decision in the instant action would have only persuasive authority in the establishment of the ratio of business between the two carriers to serve as a suggested, but not a compulsory, basis of settlement, if the engineers or firemen have any desire for a change in the apportionment of work.

We shall enlarge upon the above reasons seriatim:

1. The two Brotherhoods (engineers and firemen) are not concerned with the dispute between the trainmen and the individual members of the Brotherhood of Trainmen. There is a wrangle among the trainmen as to the respective rights and authority of their lodges and officers, but none exists with the engineers or firemen.

2. The exceptors here are the same individuals who appear as plaintiffs in the Bujol case which was filed in the state court of the parish of East Baton Rouge. A copy of the petition in that suit is attached to the present bill of complaint. We find by reference to that petition that the present exceptors have *acknowledged that the engineers and firemen are not interested parties.* As plaintiffs in the Bujol case they recite in detail the incidents which lead to the proposed change in the contract of June 2, 1927, and which has provoked the present suit.[2]

■ 3. Moreover, aside from the above considerations and regardless of the inconsistent position previously taken on this question by the exceptors, as a matter of law the engineers and firemen are not "indispensable" parties.

The case of Ford et al. v. Adkins et al., D.C., 39 F.Supp. 472, 473, though only from

---

[2] "Article 20. That upon the face of the foregoing proceedings, the said decree and all proceedings incident thereto *are restricted* to what is called the 'Alexandria Terminal' and *have no relationship whatever to the employees of the other contracting parties,* that is, the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen."

"Article 45. That the said Brotherhood of Railroad Trainmen and the said railways are the only three of the original contracting parties upon said agreement of June 2, 1927, who are now proposing to illegally alter the said agreement as is hereinabove shown and alleged; that the other two contracting parties, namely, the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen

a court of first instance, has the final authorities on the points comparatively so well presented that it is quoted from liberally:

"In Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 30 S.Ct. 10, 14, 54 L.Ed. 80, the court said: 'If the court can do justice to the parties before it without injuring absent persons, it will do so, and shape its relief in such a manner as to preserve the rights of the persons not before the court. * * * the court may * * * generally shape its decrees so as to do justice to those made parties, without prejudice to such absent persons. (Citing Payne v. Hook, 7 Wall. 425, 19 L.Ed. 260).'

"In Texas Co. v. Wall et al. [7 Cir.], 107 F.2d 45, at [page] 50, the Circuit Court of Appeals for this Circuit said: 'One is not an indispensable party to a suit merely because he has a substantial interest in the subject matter of the litigation, nor is one an indispensable party even though one's interest in the subject matter of the litigation is such that his presence as a party to the suit is required for a complete adjudication in that suit of all questions related to the litigation. The test as suggested in Waterman v. Canal-Louisiana Bank & Trust Co. (supra), may be stated thus: Is the absent person's interest in the subject matter of the litigation such that no decree can be entered in the case which will do justice between the parties actually before the court without injuriously affecting the rights of such absent person?'

" 'Persons having interest in subject-matter of litigation which may conveniently be settled therein are "proper parties," those whose presence is essential to determination of entire controversy are "necessary parties," but, if interests of parties before the court may be finally adjudicated without affecting interests of absent parties, presence of "proper parties" is not indispensable, whereas "indispensable parties" are those having such an interest in subject-matter of controversy that final decree between parties before the court cannot be made without affecting their interests or leaving controversy in such situation that

its final determination may be inequitable.' Chicago, M., St. P. & P. R. Co. v. Adams County, 9 Cir., 72 F.2d 816; Mitchell v. Smale, 140 U.S. 406, 409, 11 S.Ct. 819, 840, 35 L.Ed. 442; Wilson v. Oswego Township, 151 U.S. 56, 63, 14 S.Ct. 259, 38 L.Ed. 70; Wirgman v. Persons, 4 Cir., 126 F. 449; Commercial Casualty Ins. Co. v. Lawhead, 4 Cir., 62 F.2d 928, certiorari denied 289 U.S. 731, 53 S.Ct. 527, 77 L.Ed. 1480; Texas Co. v. Wall, 7 Cir., 107 F.2d 45."

In the case of Buss v. Prudential Ins. Co. of America, 8 Cir., 126 F.2d 960, at page 967, we find: "In Rogers v. Penobscot Mining Co., 8 Cir., 154 F. 606, 610, this court said: 'An indispensable party is one who has such an interest in the subject-matter of the controversy that a final decree cannot be rendered between the other parties to the suit without radically and injuriously affecting his interest, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience.' See, also, Bacon v. Rives, 106 U.S. 99, 1 S.Ct. 3, 27 L.Ed. 69; Williams v. Bankhead, 86 U.S. 563, 19 Wall. 563, 22 L.Ed. 184; Egyptian Novaculite Co. v. Stevenson, 8 Cir., 8 F.2d 576, 580; Silver King Coalition Mines Co. v. Silver King Consol. Mining Co., 8 Cir., 204 F. 166, 169, Ann.Cas. 1918B, 571; Sioux City Terminal R. & W. Co. v. Trust Co. of North America, 8 Cir., 82 F. 124, 126; Id., 173 U.S. 99, 19 S.Ct. 341, 43 L.Ed. 628."

4, 5, 6. As to Item 4, the motion to dismiss for failure to make necessary parties, in each of its two paragraphs, has the words "necessary parties." It is technical; but the words "indispensable parties" are not there. As to Item 5, the proof as to its content has been gleaned from the case generally, from the record, and from the arguments of attorneys. Item 6, as stated, proves itself.

Accordingly, we rule that this suit may be prosecuted by the complainant carriers against the named defendants without the necessity of the engineers and the firemen being parties.

---

and Engineers, are likewise nonresidents and non-profit union corporations organized and existing under the laws of the State of Ohio and domiciled at Cleveland therein, and that these latter organizations have not been consulted as to the proposed change, and no action has been taken against them contradictorily by anyone, and that thus *it is not necessary that the latter organizations or that anyone else should be made a party to the present injunctive proceedings other than the Brotherhood of Railroad Trainmen and the said railways.*" (Emphasis ours.)

(b) Motion to Dismiss for Failure to State a Claim or Cause of Action.

There are several reasons in support of this motion: (a) That the relief sought in the instant case will be granted by the state suit, supra, commonly known as the Bujol case; (b) that the federal court should not take jurisdiction because of the previous and concurrent state proceeding in which all matters in controversy in the instant case will be fully settled; and (c) that the instant case is vexatious, is a duplication, and will serve no purpose but to interfere with the state case.

■ In a general way, the pendency of a suit in the state court is no bar to a similar action in the federal court. Especially is this true if the controversy does not involve the possession of a res. Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077. The state rule is the same. Hope v. Madison, 191 La. 1075, 187 So. 28, and cases cited therein.

■ Adverting now to the point as to whether or not the questions now in controversy between the parties to this suit will be fully settled in the Bujol case, and that consequently the present litigation will serve no useful purpose, the reasons why the answer should be that this suit should proceed are these:

1. Neither the issues nor the parties are identical.

2. The present suit involves a federal statute and should be interpreted by a federal court.

3. The necessary parties are not before the state court and are not amenable to service of process in that court; and the points at issue will probably never be decided by the state court.

4. The proceeding in the federal court affords a more speedy and effective method for a determination of the issues.

Taking the above reasons seriatim:

■ In the Bujol case, Rapides Lodge No. 856 is not a party to the suit. The bill of complaint in the present case alleges that the Lodge is the accredited local representative at Alexandria of all yard employees of the Texas and Pacific Railway Company and the Missouri Pacific Railroad Company. For the purpose of this motion the court must assume as true all the allegations of fact made in the bill of complaint. Therefore, we must accept as true that Rapides Lodge No. 856 is the local representative of the yard employees mentioned, and, therefore, the local representative of the individual defendants who are alleged in Paragraph IV of the bill of complaint to be members of the Lodge. They are not parties to the Bujol case. They are parties to the present suit and are parties of importance. Conclusively, in the two cases the parties are not the same.

The issues are not identical, either. The general situation might be the same, but interpretation under the Railway Labor Act, not required in the state case, will necessarily form a part of the instant case. Relief from damages is sought by the complainants in the instant case, and no such object forms a part of the state case. A sequence of events that followed the judgment in the state case forms a part of the instant case. These are the letters giving notice to the carriers of an intention to hold them liable in damages in case of certain action by them. Obviously, a judgment in the state case will not settle the different issues that form a part of the present suit.

2. Since the Railway Labor Act will of necessity be interpreted in the instant suit, there follows the logical conclusion that a federal court is the better and proper organ of interpretation. Such procedure is bound to unify (and quite quickly) the federal jurisprudence.

3. The Brotherhood of Railroad Trainmen, domiciled in Ohio, is not amenable to service in the state court, either, but it has waived this right in the present litigation. Its position was just the opposite in the state case. Does it not follow, and obviously, that the state court could not give the definitive judgment that could be had in the instant case, because the Brotherhood of Trainmen would not be under the ban of its judgment?

4. We should be hesitant about promising dispatch by this court in the instant case, but we have the advantage of being just at the beginning of the case and therefore cannot be much in delay, whilst the record shows that the state case is already in great delay and the merits are far from being reached yet. The Bujol case was dismissed by the state court in Baton Rouge on a preliminary plea of exception. The transcript of appeal was filed in the Supreme Court on August 17, 1944. We are now in the month of April, 1945. The case has not

yet been assigned for hearing in the Louisiana Supreme Court. In fact, no motion has even been made to advance it on the docket. Assuming that it is a preference case, nevertheless, it will be many months after a motion to advance is presented before it would be put on the calendar for hearing. No such motion has yet been made. The Supreme Court of Louisiana will adjourn on June 30, 1945, and will not convene again until October. If the Bujol case were regarded as a preference suit in the Supreme Court of Louisiana, and if a motion were made to advance it to the preference docket, all of which is uncertain, nevertheless, it will be the latter part of 1945 or perhaps 1946 before the case can be heard. Then there will be further delays. After argument the Supreme Court will take it under advisement. There will be a delay during which the matter will be under consideration; then after decision a delay for rehearing; then probably a writ to the Supreme Court of the United States by the Brotherhood in the event the state court tried to subject it to the jurisdiction of the Baton Rouge court. Then assuming that the defendants here, plaintiffs in the Bujol case, are entirely successful, the matter will be returned to the state court in Baton Rouge for hearing on the merits. There will then be the usual delays before trial and the matter of appeal again and a repetition of the procedure described above. In all events we are justified in concluding that to proceed with the Bujol case to a final conclusion will require several years.

The second point urged in support of the motion to dismiss for failure to state a claim or cause of action is directed to the alternative relief sought pertaining to claims and issues not governed by federal law, not in actual controversy, and involving the rights of persons who are not parties to the present suit. Of course, claims and issues may enter into this suit that might be governed by the state law.

This court is competent to adjudicate the issues presented under the alternative prayer. Moreover, we are impressed with the fact that the present plaintiffs made these very points the subject of a suit in the state courts. The rights of the persons involved in the instant case may be passed upon without involving the rights of others.

Under the Declaratory Judgment Act and the exercise of discretion commanded the court by Rule 57 of the Federal Rules of Civil Procedure, we feel obliged to overrule the motion to dismiss because of the failure to state a claim or cause of action.

The following cases, particularly the first cited, will fully and thoroughly support us in our rulings on the motion to dismiss, generally and on all particular phases. Brillhart v. Excess Insurance Company of America, 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620; Western Electric Company, Inc., v. Hammond, 1 Cir., 135 F.2d 283; Carpenter et al. v. Edmonson, 5 Cir., 92 F.2d 895; Chicago Metallic Manufacturing Company v. Edward Katzinger Company, 7 Cir., 123 F.2d 518; Mutual Life Insurance Company of New York v. Krejci et al., 7 Cir., 123 F.2d 594; Firemen's Fund Insurance Company et al. v. Crandall Horse Company of Buffalo, D.C., 47 F.Supp. 78; Ætna Casualty & Surety Co. v. Quarles, 4 Cir., 92 F.2d 321.

We now come to the motion to dismiss for lack of jurisdiction over the subject matter, filed by the Brotherhood of Railroad Trainmen and the Rapides Lodge No. 856 of the same Brotherhood, because: "The matter in controversy herein is not one of a justiciable nature, and consequently, not subject to judicial review, it being a labor dispute under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and one over which Congress has foreclosed resort to the courts for enforcement of the claims asserted by plaintiffs."

Movants allege that the controversy arises under the Railway Labor Act; that clearly the case falls under Nos. 4 and 5 of the purposes of the Act, to-wit: "(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C.A. § 151a.

It has been held by the Supreme Court of the United States in General Committee of Adjustment of Brotherhood of Locomotive Engineers for Missouri-Kansas-Texas R. Co. v. Missouri-Kansas-Texas R. Co. et al., 320 U.S. 323, 64 S.Ct. 146, 152, 88 L.Ed. 76, that the command of the Railway Labor Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied.

Counsel for movant quotes the following from the above case:

"In view of the pattern of this legislation and its history the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied. Unless that test is met the assumption must be that Congress fashioned a remedy available only in other tribunals. There may be as a result many areas in this field where neither the administrative nor the judicial function can be utilized. But that is only to be expected where Congress still places such great reliance on the voluntary process of conciliation, mediation and arbitration. See H. Rep. No. 1944, 73d, Cong., 2d Sess., p. 2. Courts should not rush in where Congress has not chosen to tread.

"We are here concerned solely with legal rights under this federal Act which are enforcible by courts. For unless such a right is found it is apparent that this is not a suit or proceeding 'arising under any law regulating commerce' over which the District Court had original jurisdiction by reason of § 24(8) of the Judicial Code, 28 U.S.C. § 41(8), 28 U.S.C.A. § 41(8). Cf. People of Puerto Rico v. Russell & Co., 288 U.S. 476, 483, 53 S.Ct. 447, 449, 77 L.Ed. 903; Gully v. First Nat. Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70; Peyton v. Railway Express Agency, 316 U.S. 350, 352, 62 S.Ct. 1171, 1172, 86 L.Ed. 1525. When a court has jurisdiction it has of course 'authority to decide the case either way.' The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716. But in this case no declaratory decree should have been entered for the benefit of any of the parties. Any decision on the merits would involve the granting of judicial remedies which Congress chose not to confer."

Further, able and learned counsel for movant says that the Congress failed to provide for judicial review of many types of administrative orders or determination under the Railway Labor Act; that there is no general provision for such judicial review; that Congress has expressly provided for judicial review in only two instances.

In support, counsel refers us to the case of Switchmen's Union of North America et al. v. National Mediation Board et al., 320 U.S. 297, 64 S.Ct. 95, 99, 88 L.Ed. 61, quoting in particular therefrom the following: "Thus Congress gave the National Railroad Adjustment Board jurisdiction over disputes growing out of 'grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.' § 3, First (i), 45 U.S.C.A. § 153, subd. 1(i). The various divisions of the Adjustment Board have authority to make awards. § 3, First (k)–(o). And suits based on those awards may be brought in the federal district courts. § 3, First (p). In such suits 'the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated.' The other instance in the Act where Congress provided for judicial review is under § 9, 45 U.S.C.A. § 159. The Act prescribes machinery for the voluntary arbitration of labor controversies. § 5, Third; § 7; § 8, 45 U.S.C.A. §§ 155, subd. 3, 157, 158. It is provided in § 9 that an award of a board of arbitration may be impeached by an action instituted in a federal district court on the grounds specified in § 9, one of which is that 'the award plainly does not conform to the substantive requirements laid down by this Act for such awards, or that the proceedings were not substantially in conformity with this Act.' § 9, Third (a). When Congress in § 3 and in § 9 provided for judicial review of two types of orders or awards and in § 2 of the same Act omitted any such provision as respects a third type, it drew a plain line of distinction. And the inference is strong from the history of the Act that that distinction was not inadvertent. The language of the Act read in light of that history supports the view that Congress gave administrative action under § 2, Ninth a finality which it denied administrative action under the other sections of the Act."

In final and conclusive quotation to prove that this court is without jurisdiction in this case, counsel makes a further selection, from General Committee v. Missouri-Kansas-Texas R. Co., supra: "But it is apparent on the face of the Act that while Congress dealt with this subject comprehensively, it left the solution of only some of those problems to the courts or to administrative agencies. It entrusted large segments of this field to the voluntary processes of conciliation, mediation, and arbitration. Thus by § 5, First, Congress provided that either party to a dispute might invoke the services of the Mediation Board in a 'dispute concerning changes

in rates of pay, rules, or working conditions not adjusted by the parties in conference' and any other 'dispute not referable' to the Adjustment Board and 'not adjusted in conference between the parties or where conferences are refused.' Beyond the mediation machinery furnished by the Board lies arbitration. § 5, First and Third, § 7. In case both fail there is the Emergency Board which may be established by the President under § 10. In short, Congress by this legislation has freely employed the traditional instruments of mediation, conciliation and arbitration. Those instruments, in addition to the available economic weapons, remain unchanged in large areas of this railway labor field. On only certain phases of this controversial subject has Congress utilized administrative or judicial machinery and invoked the compulsions of the law. Congress was dealing with a subject highly charged with emotion. Its approach has not only been slow; it has been piecemeal. Congress has been highly selective in its use of legal machinery. The delicacy of these problems has made it hesitant to go too fast or too far. The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate."

Then, the likewise able and learned counsel for the carriers, granting and recognizing the jurisprudence of both the General Committee of Adjustment of Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co., and the Switchmen's Union v. National Mediation Board cases, claim that a factual study of the instant case will not place it under the applicable legal doctrines of these two cases at all, but will place it under the legal doctrines of Steele v. Louisville & N. R. Co. et al., 322 U.S. 722, 64 S.Ct. 1260; Id., 323 U.S. 192, 65 S.Ct. 225; and Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, Ocean Lodge No. 76, et al., 323 U.S. 210, 65 S.Ct. 235.

It now becomes our duty to analyze and classify the facts of the instant case and the facts of the four cited cases, to make a comparison, and to deduce from such a comparison whether or not the two cases cited by movant or the two cases cited by the carriers are applicable and controlling.

The defendants here, thirty in number, comprise two groups who have conflicting interests, or, to say the least, are antagonistic. On the one hand, we have the national Brotherhood of Railroad Trainmen, which has been supposedly duly designated as the collective bargaining agency for all the trainmen employed by both of the carriers, and on the other hand, we have twenty-nine individual defendants, all employed by the Texas and Pacific Railroad, one of the plaintiff carriers, as trainmen in the Alexandria terminal, and members of the Alexandria local trainmen's union, which is affiliated with the national Brotherhood, of which local union the Missouri Pacific trainmen likewise employed at the Alexandria terminal are also members. The Alexandria terminal is a joint terminal operated by both of these railroads.

In the consideration of the previous motion to dismiss filed by the individual defendants, we have given much of the factual background of the instant case such as the time and manner of reaching the joint contract of June 2, 1927, the respective ratio of employees of the two railroads at the time of the original contract, the changed condition of such ratio seventeen years later, in 1944, the request by the trainmen for a change in the ratio under the old contract, and some of the aspects of the suit filed by some of the employees of the T. & R. at Alexandria in the state courts; this must be imported here into the consideration of the present motion.

The railroads' position is that though they be threatened and subjected to serious risk, it is immaterial ultimately which of the two conflicting groups prevails, for the aggregate wages to be paid will be the same. The railroads urge that they are entitled to the Declaratory Judgment Act in these circumstances.

We know that in the state court proceeding,[3] where the Texas and Pacific

---

[3] The state suit is a part of the petition of the carriers. Its allegations for the purpose of these motions are to be taken as true. Here are some selected and exemplary articles of the state suit:

"10. That the latter report, favorable to petitioners position in this controversy, had been accepted by A. F. Whitney, President of the Brotherhood of Railroad Trainmen, following its rendition by the executive officers of said organization, and that under the constitution of the said Brotherhood of Railroad Trainmen, in existence at that time, and in existence at the present time, the report of the said executive officers and its acceptance by the

sought to prevent, by injunctive process, the negotiation of a new contract or a revision of the old, the national brotherhood said A. F. Whitney became final as to vigorously contended, urged and argued that the controversy there was a "labor dispute" within the meaning and intent of

the issues presented, and that for this reason and for other reasons alleged below the said Board of Appeals was without jurisdiction of said controversy and its said decree attempting to sustain said complaint was null and void and without legal efficacy or effect.

"11. That following the said illegal decree, present petitioners, acting through the general chairman of the Brotherhood of Railroad Trainmen, L. A. Aucoin, attempted to appeal to the Board of Directors of the said Brotherhood, as is shown by a true copy of said appeal dated December 30th, 1943, marked 'P-4' and attached hereto and made a part of the present petition as if written herein in extenso.

"12. That an appeal was also filed to the Grand Lodge or to the Convention of the Brotherhood of Railroad Trainmen of date December 7th, 1943, a true copy of which is likewise attached hereto, marked 'P-5', and made a part hereof as if written herein in extenso.

"13. That as to the latter appeal the said A. F. Whitney, President, directed a communication to the said L. A. Aucoin, of date, December 24th, 1943, in which he declared that the said decree by the Board of Appeals was final and that the matter was closed out and no further action could be had, as is shown by a true copy of said latter communication, marked 'P-6' and attached hereto and made a part of the present petition.

"14. That on January 8th, 1944, one G. W. Anderson, Secretary of the Board of Directors, directed a communication to the said L. A. Aucoin, in which he evaded the issue as to the appeal to that Board and otherwise took a position, in violation of the Constitution and by-laws of the said Brotherhood of Railroad Trainmen, the effect of which was to deny said appeal without any action thereon by said Board, as is shown by said communication, a true copy of which marked 'P-7' is attached hereto and made a part of the present petition as if written herein in extenso.

"15. That petitioners have thus exhausted all practical and available remedies within the said Brotherhood of Railroad Trainmen, and that the effect of said decree will materially alter the said agreement of date June 2nd, 1927, and if permitted to be carried out will prejudice petitioners individually and collectively as to their working hours, rate of pay, and working conditions, and as to their seniority rights and privileges, and as to their substantial rights to earn a living."

Then Article 16 is: "Now petitioners show that the said decree is absolutely null and void and without legal efficacy or effect for these reasons, to-wit:" Then follow fifteen paragraphs of reasons, and notably we quote the 25th paragraph, because of its allegation of fraud:

"That in any event the action of the said A. F. Whitney in preventing the appeal to the Convention and the action of the said G. W. Anderson acting in cooperation and collusion with the said A. F. Whitney in evading and defeating the attempted appeal to the Board of Directors is arbitrary and capricious, and is not only in violation and defiance of the Constitution of the said Brotherhood of Railroad Trainmen, but is also contradictory to the policy and attitude of the said A. F. Whitney in other cases involving the same issue and is contrary to the legal opinions and the administrative policies heretofore carried out and applied by the said Brotherhood of Railroad Trainmen in reference to such matters."

Then follow some further paragraphs, giving reasons. We quote the three following (Nos. 35, 36, and 51):

"35. Petitioners allege on information and belief that the reason for this change on the part of the said A. F. Whitney is traceable directly to a political deal made between him and the said J. H. Bromley and R. L. Hickman which was consummated just prior to the time the said decree was handed down.

"36. That shortly after this deal the said A. F. Whitney contacted certain members of the said Board of Appeals and prevailed upon them to actually change an opinion which had already been prepared by the said Board of Appeals denying the said complaint and thus inducing the majority of the members of the said Board of Appeals to agree upon and to render the decree complained about."

"51. That the present is not a labor dispute, but that the nature of the rights asserted are such that insofar as petitioners are concerned they may be lost altogether if the injunctive relief here sought is not granted, whereas such injunctive relief cannot materially alter or prejudice any of the other parties or involve any injury to them whatever if the temporary restraining order sought herein is granted, as the only effect thereof will be to maintain in force and effect an agreement which has governed the rights of all interested parties for a period of more than fifteen years."

Louisiana Act No. 203 of 1934 (Dart's Gen. Stats. Sec. 4379.5; Dart's C.P. Art. 309.1) which prohibits in such cases use of the injunctive process. Dehan et al. v. Hotel and Restaurant Employees and Beverage Dispensers, Local Union No. 183, et al., La. App., 159 So. 637; Johnson v. Milk Drivers and Dairy Employees Union, Local No. 854, La.App., 195 So. 791. Here, by its motion to dismiss, the same Brotherhood contends that the issue is "not justiciable" at all. Citing: Switchmen's Union v. National Mediation Board, supra, and General Committee v. Missouri-Kansas & Texas R. Co., supra.

■ We are so satisfied from the facts that the action for a declaratory judgment is permitted that we shall not discuss the question, nor cite the jurisprudence. The Declaratory Judgment Act fits peculiarly well for the adjustment of controversies between employers and unions, or between employers and employees, whether union members or not. We think the Act legally adaptable to this odd case, too, where the carriers are placed in a dilemma, because of the differences (involving constitutional rights) between two antagonistic groups of the same union.

A host of recent cases proves it, and particularly many of the cases cited by us in this opinion.

Part of Rule 57 reads, as follows: "* * * The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate. * * *"

■ A classification of the facts in this case shows clearly that there is no dispute here between an employer and its employees; the dispute is altogether between some employees and some other employees. Certainly there is no dispute between either one of the carriers and its employees growing out of "grievances," or "interpretation," or "application" of agreements concerning "rates of pay," "rules," or "working conditions." If there were, the Adjustment Board would have authority to make specific "awards" which are enforcible in the federal courts. Section 3 of the Act, 45 U.S.C.A. § 153.

We must quote the forceful language in the brief of counsel for the carriers:

"The controversy here is not between the carriers and their employees at all; but, instead and only, between antagonistic groups of employees, in which dispute neither carrier has the slightest interest or concern—except and solely, to protect itself from being victimized as an innocent bystander or ground between these upper and nether millstones—the only objective of thus seeking a declaratory determination of its status, rights and obligations. Neither of these two carriers has taken any position or urged any contention in this dispute between their respective groups of employees. So long as the terminal work is done in the Alexandria yards they have no concern as to which group does what proportion of it, so long as identical rules, working conditions and rates of pay apply to both groups of employees, as here. Of course, each carrier has an abstract feeling of greater interest and loyalty to its own men and a normal desire to see them prosper. But, in no sense and to no extent here is either of these carriers a disputant in this controversy; has made no appearance, representation or presentation as to the division of this work between their respective employees; and, as a legal concept, are here altogether neutral and entirely without interest as to how this controversy over the division of the work is resolved, as between the conflicting interests of these antagonistic groups, all members of the same union and represented by the same designated collective bargaining agency. Therefore, under the basic and unambiguous language of the Railway Labor Act, this is not a dispute between employer and employee and, hence, not such a dispute as within the jurisdiction and authority of the National Adjustment Board thereby created and empowered.

"Furthermore, this dispute does not involve any 'grievances' or the interpretation or application of any agreement concerning rules, rates of pay or working conditions, within the meaning of those terms as used in the provisions of Sec. 3 of the Railway Labor Act conferring jurisdiction upon National Adjustment Boards.

"No 'grievance', as that term is used in labor legislation, practice and jurisprudence is here involved. Neither carrier instigated, began or provoked this employee rivalry, nor has either done anything or failed to do anything to occasion it. A labor 'grievance' is a wrong or an injury done or permitted *by an employer* which gives ground for complaint by an employee *through his designated collective bargaining agency*, because it is unfair, unjust, oppressive, unlawful or in violation of some

agreement. To be considered by an Adjustment Board at all it must be asserted by the labor organization and may not be by an individual member or group of members thereof. (Administrative Procedure in Government Agencies, Senate Document No. 10, 77th Cong., 1st Sess.; citing over 400 rulings of the National Adjudgment Board to that effect.)

"Nor is there here at issue any question as to the proper interpretation or application of any contract or agreement. All admit that—up to now—the terms and provisions of the existing contract, dated June 2nd, 1927, are being regarded as effective and strictly adhered to by all concerned. This dispute is between rival and antagonistic groups of employees as to whether or not there should be negotiated a new contract, which, admittedly, is not yet in existence; whether or not the 1927 basis for apportioning the work as between these rival groups of employees is fair in 1945; whether or not the findings of their own designated bargaining agency—the Brotherhood—is reasonable, fair and honest, as one group of its members asserts, or unfair, collusive, fraudulent and dishonest, as is asserted by the other group of employees."

We rule that this controversy is not such a "labor dispute" as the Railway Labor Act relegates to any national or regional adjustment board, nor does it come within the purview of the National Mediation Board or any other administrative agency provided by the ·Railway Labor Act.

The primary function of the Mediation Board is to arbitrate disputes between employer and employee. We cannot say that such a status exists here.

The only portion of the Act dealing with disputes among employees is "Sec. 2, Ninth", which authorizes the Mediation Board to intervene or be resorted to where such disputes involve "who are the representatives of such employees designated and authorized" to act on behalf of the craft as its collective bargaining agency.

One might say at this very point: Why does not the court dismiss the case for want of jurisdiction because the administrative agencies of the Railway Labor Act have not been exhausted as yet by the objecting and dissatisfied group of employees? The answer is that there is no question as to who is the designated and authorized representative of the employees; the contention of the dissatisfied group of employees, as attested by the sanctity of their oaths in the state suit and proved to be meaningfully serious by the threat of suit for damages, is that there was fraud in such a designation and authorization and that there was flagrant violation of the constitution and by-laws of the organization of which they are members. Total loss of employment, partial loss of employment, and the loss of seniority rights, are the property rights at issue—all protected under the Federal Constitution. This very point is what places this case factually under the legal doctrine of the two cases cited by the carriers, to-wit: the Steele and Tunstall cases. But we are getting ahead of our knitting.

It would be trite for us to analyze at length the two well-known landmark cases affecting the relations of capital and labor, engaged in railroad transportation, Texas & N. O. R. Co. v. Brotherhood of Railroad & Steamship Clerks, 1930, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, and the case of Virginian R. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 57 S.Ct. 592, 599, 81 L.Ed. 789. The great departure of these cases was that, though amicable adjustment of labor disputes and voluntary submissions to arbitration were still favored, the outstanding feature of the act of 1926 was that certain definite legal obligations followed, such as the provision for an enforcement by the courts of awards in arbitration proceedings. Such awards were made conclusively definite and, after certain delays, they had the force of final court judgments, without appeal.

The Virginian case gave us, additionally, the significance of the amendment of 1934 in the following language: "The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by section 2, First."

■■■ Definitely, we do not think these two cases indicate that the National Mediation Board has the authority or jurisdiction to consider the instant case involving rivalry between two groups of employees,

276

all members of the same union, and a faction of which is asserting that its constitutional rights have been violated within the union.

Obviously, since there is nothing in the language of the Railway Labor Act precluding the Court's consideration of such a dispute as here involved and this kind of a dispute is not within the function, power, authority or jurisdiction of either the Adjustment or the Mediation Boards, the only administrative authorities of primary jurisdiction provided by that Act, how can it be seriously contended that the Railway Labor Act precludes the exercise by the courts of their, otherwise undoubted, general jurisdiction over this controversy?

Furthermore, granting for the sake of argument that this dispute be cognizable by the administrative machinery of the Railway Labor Act, since neither party has chosen to invoke the procedure of the Act, we believe the jurisdiction of this court because of diversity of citizenship and amount is not precluded. · See the case of Washington Terminal Co. v. Boswell, 1941, 75 U.S.App.D.C. 1, 124 F.2d 235, certiorari granted 315 U.S. 795, 62 S.Ct. 916, 86 L.Ed. 1197, and decision affirmed 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694. At this very juncture, without more ado, and without anything to say further, we should overrule the motion to dismiss.

We have already considered the legal conclusions of the cases relied upon by the Brotherhood. We should make a gist of their facts.

The Switchmen's Union case was an action by an independent yardmen switchmen's union on the New York Central Lines west of Buffalo against the National Mediation Board and the Brotherhood of Railroad Trainmen, seeking to have the Federal Court in the District of Columbia cancel a determination and certification by that Board of that Brotherhood as the collective bargaining agency for all yardmen on the New York Central Lines. Being unable to agree among themselves, because the Trainmen's Brotherhood wished to represent all yardmen and the yardmen west of Buffalo wished separate representation by their independent switchmen's union, the services of the Mediation Board were invoked by the ˙National Brotherhood. It called an election, designating all yardmen as participants and the Brotherhood was chosen. The District Court upheld the action of the Board for but a single representative; and, by a divided vote the United States Court of Appeals for the District of Columbia affirmed. 77 U.S.App.D.C. 264, 135 F.2d 785.

Upon certiorari, the case was reversed on the ground that the courts are without power to review such a certification by the National Mediation Board, because, under the Railway Labor Act such a certification is conclusive and was by Congress so intended.

What is the distinction between that decision and the instant case before us?

We are not here confronted with any dispute as to which is the lawfully designated collective bargaining agency; nor with any attempt to judicially set aside any order, award or certification of any administrative tribunal, created by the Railway Labor Act; nor, as shown above, with any dispute which is within the jurisdiction, function, or authority of any such administrative tribunal; nor with any procedure whatever under the system or administrative machinery provided for by the Act.

The contention of movants, however, is that the content of the decision infers that, since the Railway Labor Act contains no general provision for a court review of such administrative action as there presented, and it expressly provides for court review of administrative action in only two specified instances, there exists no court jurisdiction in any "labor dispute" wherein the provisions of the Railway Labor Act may be, directly or incidentally, involved. In other words, no "labor dispute" may, under any circumstances, be or become a "justiciable issue" and the acts or conduct of a labor organization or its members is altogether beyond the purview of court control or supervision; or, as phrased in the Brotherhood's motion to dismiss, the present "labor dispute" is one over which Congress, by enacting the Railway Labor Act and setting up the (alternative and additional) remedy via the administrative machinery thereby created, "has foreclosed resort to the courts."

After a careful reading of the historical review of the jurisprudence in the Switchmen's Union case, we conclude that the contention and the conclusion, upon which this Brotherhood's motion to dismiss is solely predicated, that the courts have no jurisdiction at all over "labor disputes"— even those arising under the Act, where either not of a character delegated to the administrative procedure, or, where not by

the interested parties or the public interest referred—are not warranted or permitted. The author of the case does not touch at all the many other "labor disputes" to which the general jurisdiction laws remain entirely applicable.

We conclude that there is nothing either in the Railway Labor Act or in the Switchmen's Union case which could deprive this court of jurisdiction under the general jurisdictional grounds here pleaded. The instant case involves not only no administrative act, but no carrier-employee difference. It involves a dispute between the recognized Brotherhood collective bargaining agency and some of its rebellious members. All that the carriers seek by this action is protection by having their rights and status jurisdictionally defined in the face of threatened punitive action by the dissatisfied group.

Now, for a statement of the factual background of the General Committee, etc., of Brotherhood of Locomotive Trainmen v. Missouri-Kansas-Texas R. Co. case, supra:

The dispute here concerned the authority of two national railroad brotherhoods (engineers and firemen) as to which had the right to represent a certain class of employees as the collective bargaining agency. Each had been the designated representative of its respective craft. Under the engineers' contract, demoted engineers were assigned to act as firemen under certain conditions, to be called for service as engineers, according to their seniority as engineers, when required for emergency engineer service; their seniority list to be handled by the engineers' local chairman instead of the management.

The assignment of engineers in order of seniority was from (1) the regular run list; (2) the freight service pool; (3) the extra board; (4) from the list of emergency engineers (demoted engineers acting as firemen). The Firemen's Brotherhood whose members were entitled to become engineers after satisfactory terms of service and qualifying tests, objected that the local chairman of the engineers prejudiced their men by advancing the assignment of engineers in the freight pool instead of calling upon the emergency list.

Failing to agree by negotiation, the Firemen's Brotherhood and the railroad joined in submitting the matter to the National Mediation Board—the Engineers' Brotherhood refusing to participate. That board effected a mediation agreement, which eliminated the alleged favoritism and turned the seniority lists back to management control.

Whereupon the Engineers' Brotherhood brought a declaratory judgment action, seeking to set aside the mediation agreement and have themselves declared solely authorized to represent the so-called emergency engineers. The railroad merely sought to ascertain the rights of the respective parties in interest. But the Firemen's Brotherhood challenged the court's jurisdiction, alternatively supporting the mediation contract. The District Court held that the carriers could deal with whichever Brotherhood they chose. The Court of Appeals (5 Cir., 132 F.2d 91) held that both Brotherhoods had an interest, that neither had an exclusive right to bargain, and that unless the engineers joined the carriers they (the carriers) could terminate the mediation agreement. The Supreme Court held the issue not justiciable and the court to be without jurisdiction.

In interpreting the Missouri-Kansas-Texas decision, it is necessary to remember throughout that the sole ground of federal jurisdiction asserted is the "federal question" involved, to-wit: that the proceeding arose under the Railway Labor Act, a federal law "regulating commerce"; hence, the jurisdictional provisions of Section 24 (8) of the Judicial Code, 28 U.S.C.A. § 41(8) applied. That no diversity of citizenship was involved is also to be recognized.

As we shall try to develop, the most which can be said is the decision holds that where (1) a right is one which is created by the act (a right committed by that act solely to voluntary mediation, conciliation and arbitration), and (2) is of such a character as to be by that act, assigned for determination by the administrative machinery therefor provided, and (3) only the enforcement of its disposition remaining which is, by that act, specifically entrusted to the courts, then and only under those circumstances is such an action such a "labor dispute" over which that administrative jurisdiction is exclusive and not one presenting a "justiciable issue" to come within the general jurisdiction laws otherwise applicable.

Justice Douglas says the following in the case: "We are here concerned solely with legal rights under this federal Act which are enforcible by courts. For unless such a right is found it is apparent that this is

not a suit or proceeding 'arising under any law regulating commerce' over which the District Court had original jurisdiction by reason of § 24(8) of the Judicial Code, 28 U.S.C. § 41(8), 28 U.S.C.A. § 41(8). Cf. People of Puerto Rico v. Russell & Co., 288 U.S. 476, 483, 53 S.Ct. 447, 449, 77 L.Ed. 903; Gully v. First Nat. Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70; Peyton v. Railway Express Agency, 316 U.S. 350, 352, 62·S.Ct. 1171, 1172, 86 L.Ed. 1525. When a court has jurisdiction it has of course 'authority to decide the case either way.' The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716. But in this case no declaratory decree should have been entered for the benefit of any of the parties. Any decision on the merits would involve the granting of judicial remedies which Congress chose not to confer."

Therefore, when Justice Douglas holds that the contract between the Firemen's Brotherhood and the railroad, which was mediated by the Mediation Board, to which both parties had voluntarily submitted their differences, and over which the courts are, by express provision of that act, given only enforcement authority, presents no justiciable issue at the behest of a third party, who declined to participate, but, thereafter, on the sole jurisdictional ground that his action arises under the same act, seeks to have the court set aside and substitute its own discretion, that ruling is, indeed, a far cry from the contention made here, that courts are deprived of all jurisdiction in any kind of labor dispute.

Since we are of the view that the character of dispute in the instant case is not properly within the function of the Mediation or Adjustment Boards, both the Missouri-Kansas-Texas Emergency Engineers and the New York Central Yard Switchmen's cases are not controlling.

We come now to the analysis and classification of the two cases cited by the carriers to support jurisdiction.

In the Tunstall case, supra, the facts are that the Court of Appeals (4 Cir., 140 F. 2d 35, 36) affirmed dismissal for want of jurisdiction of a declaratory judgment action brought by a negro fireman against the National Brotherhood and the railroad, seeking to enjoin the union from representing the negro firemen who are permitted to be members of it, but not promoted under their contract with the railroad, and

praying for damages against that union and for seniority, etc.

The Circuit Court held:

"There is no allegation of diversity of citizenship and jurisdiction of the suit can be maintained only on the ground that the controversy is one arising under the laws of the United States. In so far as the suit is grounded on wrongful acts of the defendants, it cannot be said to be one arising under the laws of the United States, even though the union was chosen as bargaining representative pursuant to such laws. * * * We think, however, that recent decisions of the Supreme Court hold conclusively that there is no jurisdiction in the federal courts to afford relief under the act except where express provisions of the act so indicate. Brotherhood of Ry. & S. S. Clerks, etc., v. United Transport Service Employees of America, [320 U.S. 715], 64 S.Ct. 260, decided Dec. 6, 1943; Switchmen's Union of North America, etc., v. National Mediation Board, et al. [320 U. S. 297], 64 S.Ct. 95, [88 L.Ed. 61]; General Committee, etc., v. Southern Pac. Co. [infra]; General Committee, etc., v. Missouri-Kansas-Texas R. Co. * * *

"The court here is asked, in enforcement of the provision of the act that employees shall have the right to bargain collectively through representatives of their own choosing, to declare the duty of a representative admittedly chosen by a majority of the craft, and to interfere by injunction with the process of bargaining undertaken pursuant to the act on the ground that the purposes of the act are being violated. This, as we interpret the foregoing decisions of the Supreme Court, we have no power to do."

On certiorari, the United States Supreme Court [323 U.S. 210, 65 S.Ct. 236] on December 18, 1944, reversed and remanded, holding, under authority of the Steele case, decided the same day:

"The District Court dismissed the suit for want of jurisdiction. The Circuit Court of Appeals for the Fourth Circuit affirmed, 140 F.2d 35, on the ground that the federal courts are without jurisdiction of the cause, there being no diversity of citizenship and, insofar as the suit is grounded on the wrongful acts of respondents, it is not one arising under the laws of the United States, even though the union was chosen as bargaining representative pursuant to the Railway Labor Act. * * *

"For the reasons stated in our opinion in .the Steele case the Railway Labor Act itself does not exclude the petitioner's cause of action from the consideration of the federal courts. * * *

"We also hold that the right asserted by petitioner which is derived from the duty imposed by the Railway Labor Act on the Brotherhood, as bargaining.representative, is a federal right implied from the statute and the policy which it has adopted. It is the federal statute which condemns as unlawful the Brotherhood's conduct. * * * The case is therefore one arising under a law regulating commerce of which the federal courts are given jurisdiction. * * *"

In other words, the court upheld the jurisdiction, without diversity of citizenship, of a controversy within the union between different classes of employees, as one arising under a law regulating interstate commerce (the Railway Labor Act), and when there was no administrative remedy available, which is a condition prerequisite to holding as did Justice Douglas, that such situations present no "justiciable issue."

 In other words, in this Tunstall case, the Supreme Court unanimously held that, even without any diversity of citizenship as a jurisdictional ground, and in a dispute between a minority group of .employees, (the negro firemen) and their national Brotherhood (with their white firemen members) the federal court has jurisdiction, in a declaratory judgment action, in a "labor dispute" case, arising under the Railway Labor Act.

That decision is predicated upon the factually similar and more extensively discussed decision rendered the same day, by a likewise unanimous court. And this is the second case relied upon by the carriers —Steele v. Louisville & N. R. Co., supra.

This is a class action brought by a negro locomotive fireman employed by defendant railroad against his employer and Brotherhood, designated under the Railway Labor Act as the exclusive bargaining representative of his entire craft, although, under the ritual of the union, negro firemen were excluded from membership. By established practice of long standing, only white firemen could be promoted to be engineers. The Brotherhood had notified the railroad that it desired to amend the labor contract, so as to prohibit the employment of any but "promotable" new firemen—which, of course, was designed to ultimately eliminate all negro firemen, as soon as those then in service passed on.

A new contract, not going quite that far, but tending to seriously hamper and prejudice the negro firemen was effected by that Brotherhood—over the protest and appeals of the negro firemen, including petitioner.

The bill of complaint asks for discovery of the manner in which the agreements have been applied and in other respects; for an injunction against enforcement of the agreements made between the Railroad and the Brotherhood; for an injunction against the Brotherhood and its agents from purporting to act as representative of petitioner and others similarly situated under the Railway Labor Act, so long as the discrimination continues, and so long as it refuses to give them notice and hearing with respect to proposals affecting their interests; for a declaratory judgment as to their rights; and for an award of damages against the Brotherhood for its wrongful conduct.

Upon a dismissal of petitioner's complaint for want of a cause of action by the Supreme Court of Alabama (and for the sake of brevity we shall omit the reasoning of the state court), 245 Ala. 113, 16 So.2d 416, certiorari was granted by the Supreme Court of the United States. 322 U.S. 722, 64 S.Ct. 1260. The main theme of this decision (a unanimous one, and differently from the sharp and close divisions in the two cases of movants), was stated by Chief Justice Stone as the organ of the court in the following language [323 U.S. 192, 65 S.Ct. 230]:

"But we think that Congress, in enacting the Railway Labor Act and authorizing a labor union, chosen by a majority of a craft, to represent the craft, did not intend to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority. Since petitioner and the other negro members of the craft are not members of the Brotherhood or eligible for membership, the authority to act for them is derived not from their action or consent but wholly from the command of the Act.

"* * * The purposes of the Act declared by § 2 are the avoidance of 'any interruption to commerce or to the operation of any carrier engaged therein,' and this aim is sought to be achieved by encouraging 'the prompt and orderly settlement of

all disputes'. * * * These purposes would hardly be attained if a substantial minority of the craft were denied the right to have their interests considered at the conference table and if the final result of the bargaining process were to be the sacrifice of the interests of the minority by the action of a representative chosen by the majority. The only recourse of the minority would be to strike, with the attendant interruption of commerce, which the Act seeks to avoid.

"* * * The fair interpretation of the statutory language is that the organization chosen to represent a craft is to represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents."

The following explanation by the Chief Justice is quite applicable here:

"This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied * * *. Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences. Here the discriminations based on race alone are obviously irrelevant and invidious. Congress plainly did not undertake to authorize the bargaining representative to make such discriminations. * * *

"The representative which thus discriminates may be enjoined from so doing, and its members may be enjoined from taking the benefit of such discriminatory action. No more is the Railroad bound by or entitled to take the benefit of a contract which the bargaining representative is prohibited by the statute from making. In both cases the right asserted, which is derived from the duty imposed by the statute on the bargaining representative, is a federal right implied from the statute and the policy which it has adopted. It is the federal statute which condemns as unlawful the Brotherhood's conduct. 'The extent and nature of the legal consequences of this condemnation, though left by the statute to judicial determination, are nevertheless to be derived from it and the federal policy which it has adopted.' Deitrick v. Greaney, 309 U.S. 190, 200, 201, 60 S.Ct. 480, 485, 84 L. Ed. 694; Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 177, 63 S.Ct. 172, 173, 174, 87 L.Ed. 165; cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838."

The general jurisdiction of the federal courts is applicable, even to a "labor dispute"—where the determination of that dispute is not otherwise provided for by the Railway Labor Act. That is held, more specifically: "Since the right asserted by petitioner 'is * * * claimed * * under the Constitution' and a 'statute of the United States,' the decision * * * is reviewable here * * *. The question here presented is not one of a jurisdictional dispute, determinable under the administrative scheme set up by the Act, cf. Switchmen's Union v. National Mediation Board, 320 U. S. 297, 64 S.Ct. 95 [88 L.Ed. 61]; General Committee v. Missouri-Kansas-Texas R. Co., 320 U.S. 323, 64 S.Ct. 146 [88 L.Ed. 76]; General Committee v. Southern Pacific Co., 320 U.S. 338, 64 S.Ct. 142 [88 L. Ed. 85]; Brotherhood of Railway & Steamship Clerks v. United Transport Service Employees, 320 U.S. 715, 64 S.Ct. 260; Id., 320 U.S. 816, 64 S.Ct. 435, or restricted by the Act to voluntary settlement by recourse to the traditional implements of mediation, conciliation and arbitration. General Committee v. Missouri-Kansas-Texas R. Co., supra, 320 U.S. 332, 337, 64 S.Ct. 150, 153 [88 L.Ed. 76]. There is no question here of who is entitled to represent the craft, or who are members of it, issues which have been relegated for settlement to the Mediation Board, Switchmen's Union v. National Mediation Board, supra; General Committee v. Missouri-Kansas-Texas R. Co., supra. Nor are there differences as to the interpretation of the contract which by the Act are committed to the jurisdiction of the Railroad Adjustment Board."

We believe that the cause of action of the nonsubmissive, to say the least, if not rebellious, members of the Brotherhood, represented by their action in the state court, forming a part of the instant case, represents a constitutional right similar to the constitutional right of the negro, which

had been violated in the Steele case. "In the absence of any available administrative remedy, the right here asserted is of judicial cognizance, to a remedy for breach of the statutory duty * . * *. That right would be sacrificed or obliterated if it were without the remedy which courts can give for breach of such a duty or obligation and which it is their duty to give in cases in which they have jurisdiction. Switchmen's Union v. National Mediation Board, supra, 320 U.S. 300, 64 S.Ct. 97 [88 L.Ed. 61]; Stark v. Wickard, 321 U.S. 288, 306, 307, 64 S.Ct. 559, 569, 570 [88 L.Ed. 733]. Here, unlike General Committee v. Missouri-Kansas-Texas R. Co., supra, and General Committee v. Southern Pacific Co., supra, there can be no doubt of the justiciability of these claims. As we noted in General Committee v. Missouri-Kansas-Texas R. Co., supra, 320 U.S. 331, 64 S.Ct. 150 [88 L.Ed. 76], the statutory provisions which are at issue are stated in the form of commands. For the present command there is no mode of enforcement other than resort to the courts, whose jurisdiction and duty to afford a remedy for a breach of statutory duty are left unaffected. The right is analogous to the statutory right of employees to require the employer to bargain with the statutory representative of a craft, a right which this Court has enforced and protected by its injunction in Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, supra, 281 U.S. 556, 557, 560, 50 S.Ct. 429, 430, 74 L.Ed. 1034, and in Virginian R. Co. v. System Federation, supra, 300 U.S. 548, 57 S.Ct. 599, 81 L.Ed. 789, and like it is one for which there is no available administrative remedy."

Accordingly, in compliance with the above opinion, we shall sign a judgment dismissing the several motions made by movants.